IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 15, 2011 Session

## JEAN GARMAN v. GUY GARMAN

**Direct Appeal from the Blount County Circuit Court**
**No. E-22762      Jon Kerry Blackwood, Senior Judge**

**No. E2010-01215-COA-R3-CV - FILED - MAY 16, 2011**

This is a divorce case. Wife appeals the trial court's order concerning: (1) the valuation of
Husband's medical practice; (2) the division of certain marital debt; and (3) the award of
transitional alimony, rather than alimony *in futuro*, and the amount thereof. Discerning no
error, we affirm.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which DAVID R. FARMER, J.,
and JOHN W. MCCLARTY, J., joined.

William A. Mynatt, Jr., Knoxville, Tennessee, for the appellant, Jean Garman.

Martha Meares and Paul R. Dillard, Jr., Maryville, Tennessee, for the appellee, Guy Garman.

**OPINION**

### I. Background Facts & Procedure

Jean Garman ("Wife," or "Appellant") and Dr. Guy Garman ("Husband," or
"Appellee") were married on July 3, 1993. Three children were born to the marriage. Early
in these divorce proceedings, the parties entered into a permanent parenting plan, addressing
both child custody and support. The trial court approved and entered a parenting plan on
May 26, 2010, which requires Dr. Garman to pay $3,010.00 per month in child support. No
issues concerning the children are raised in the instant appeal.

Dr. Garman is an ear, nose, and throat doctor. When the parties first met, Dr. Garman
was in the fifth year of a six year internship, and was earning approximately $30,000 per
year. At that time, Ms. Garman, who holds an undergraduate degree and a Master degree in

Business Administration from Cornell University, was working for a textile importing company in Belcamp, Maryland, and was earning approximately the same income as Dr. Garman. When the parties married, Ms. Garman left her job, and the two relocated to Iowa for six weeks, then to Joplin, Missouri. Ms. Garman worked as a financial analyst for a bank in Joplin while Dr. Garman completed his residency. In 1996, after the parties' first child was born, and during Ms. Garman's second pregnancy, the parties briefly relocated to Chicago. From that time, until the parties separated sometime in October 2008, Ms. Garman did not work outside the home.

In July 1997, the parties moved to Maryville, Tennessee, where Dr. Garman joined a medical practice, the Otolaryngology Center of East Tennessee ("OCET"). After a year and a half probationary period, Dr. Garman was given the opportunity to buy a 50% share in OCET. When Dr. Garman bought his interest, he paid $92,000.00, which was comprised of $20,000.00 from the parties' savings and $72,000.00 from Ms. Garman's mother, Barbara Stratton. In the fall of 2008, Dr. Garman and his partner, Dr. Adham, brought in a third partner. The third partner bought into the practice for $25,000.00, with $12,500.00 each going to Dr. Garman and Dr. Adham. In conjunction with this transaction, the three partners also executed a "buy/sell" agreement, which would be triggered if any partner decided to leave the practice.

When the parties moved to Maryville, Ms. Stratton loaned the parties money in order to purchase a home, on which she would hold a mortgage to secure the debt. There is some conflict in the record, discussed in more detail below, as to whether Ms. Stratton actually expected repayment of this money. Ms. Garman's family is the owner of an upscale furniture manufacturing and distribution company. Ms. Garman and her six siblings share interests in the family's various trust accounts. The parties eventually sold their first Maryville home and built a larger residence on Montvale Road in Maryville. The record indicates that the mortgage owed to Ms. Stratton on the first marital home was "rolled" into the Montvale residence mortgage, and Ms. Stratton extended additional funds, which resulted (according to Ms. Garman's testimony) in approximately $195,000.00 in unsecured debt owed to Ms. Stratton. Because of Ms. Garman's family's resources, the parties took multiple vacations during the marriage, which were paid for by Ms. Garman's family. According to the record, Ms. Stratton also gave her daughter $10,000 per year without written documentation. There is some dispute in the record as to whether this money was a gift or whether it was an offset against the mortgage amount owed to Ms. Stratton.

All evidence demonstrates that these parties lived an extravagant lifestyle, which was well beyond their means. By the time of the trial, the parties had accumulated more than $60,000 in credit card debt, some of which was accruing interest at a rate of 24% per annum. The parties' home equity line of credit had an outstanding balance of approximately

$30,000.00. According to Dr. Garman's testimony, in the summer of 2008, Ms. Garman, who was in charge of handling the parties' finances, disclosed to Dr. Garman that the debt was becoming untenable. The record reveals that, during the marriage, Dr. Garman suffered from bouts of depression and alcoholism, and that the parties often fought concerning Ms. Garman's reluctance to return to the workforce despite the mounting marital debts. To further complicate matters, Dr. Garman began an intimate relationship with another woman. The parties separated in October of 2008.

Following the separation, Dr. Garman moved out of the marital residence. Ms. Garman subsequently moved out of the marital home, and into a home that was purchased by Ms. Stratton. At that point, Dr. Garman moved back into the marital residence until he relocated to St. Croix in the United States Virgin Islands, *see infra*. After the parties separated, Ms. Garman took employment with Chatham Interiors as a business manager. This was not a full time position; rather, the record demonstrates that Ms. Garman worked up to ten hours per week (although she usually worked approximately 5.7 hours per week), at a rate of $15.00 per hour. Ms. Garman's family supplemented her income during the parties' separation. During the separation, numerous debts of the parties became seriously delinquent, including the mortgage on the Montvale home and the loan on Ms. Garman's vehicle.

In November 2008, Dr. Garman moved to St. Croix. Because Dr. Garman planned to start a new medical practice in St. Croix, he had advised his partners at OCET of his intent to leave that practice. Under the "buy/sell" agreement, *supra*, Dr. Garman was paid approximately $15,000.00 for his interest in the OCET practice. The parties split the $15,000.00; however, Ms. Garman was not satisfied with the amount Dr. Garman received from his partners, and retained the services of an expert CPA valuator, Van Elkins, to determine the value of Dr. Garman's share of OCET as an ongoing concern.

On December 4, 2008, Ms. Garman filed a complaint for divorce against Dr. Garman, alleging, *inter alia*, that Dr. Garman was guilty of inappropriate marital conduct. By her complaint, Ms. Garman requested that the court make an equitable division of the marital property and debt. The original complaint did not contain a request for alimony. On January 12, 2009, Dr. Garman filed an answer and counter-complaint for divorce. Ms. Garman filed an amended complaint for divorce on June 26, 2009, adding a request for temporary and permanent spousal support. On October 28, 2009, the trial court held a hearing on Ms. Garman's request for spousal support. By order of November 3, 2009, the court awarded Ms. Garman the sum of $1,350 per month in *pendente lite* support for a period of three months at the end of which time the matter was to proceed to final hearing. In its November 3 order, the trial court specifically noted that a review of each of the parties' affidavits of monthly income and expenses demonstrated that the "parties have lived beyond their means for

several years." According to Dr. Garman's affidavit, he was bearing the totality of the parties' financial obligations, which included, but were not limited to, three mortgages, Ms. Garman's car payment, and a substantial credit card payment, in addition to the court-ordered support obligations.

After the October 28, 2009 hearing, Dr. Garman fell into arrears on his monthly child support and alimony payments. In response to Ms. Garman's motion for contempt, Dr. Garman asked the court to allow him access to his sizable 401(k) account for purposes of bringing his support obligations current, paying marital liabilities, and paying attorney's fees and litigation expenses. On February 8, 2010, the court entered an order allowing Dr. Garman to access the retirement funds; however, the court held that any withdrawals would be considered part of Dr. Garman's share of the marital estate. Specifically, Dr. Garman was allowed to withdraw $65,000.00 from a TD Ameritrade Account and $15,000.00 from a SunTrust 401(k) account. The Montvale home mortgage was brought current, and the house was subsequently sold. After the mortgage debt to Ms. Stratton was discharged, the parties received a total of approximately $6,000.00.

The final hearing began on January 25, 2010, and evidence was adduced for a total of five days. The final day of the hearing was April 8, 2010. Thereafter, the court took the matter under advisement, and on April 19, 2010, issued its findings of fact and conclusions of law, which provide, in relevant part, as follows:

> A few observations are necessary before the Court addresses the value of the marital estate and its division. The husband is not a credible witness. Although extremely intelligent and articulate, his attitude to the problems confronting the financial difficulties of this marriage has been egocentric. For example, he places the lion's share of the blame for the financial plight of the parties on the wife because she handled the finances for the parties. However, it is obvious that the financial collapse of the marriage was a lifestyle in which both parties participated.... While his testimony does not embrace total untruths, much of his testimony is half truths. His testimony was an exercise in sophistry and his logic was specious....This is not to conclude that the wife's testimony is infallible. Her answers were often angry, combative and prolix. Nevertheless, her testimony was more credible, reasonable and verified by other evidence in the [r]ecord. Finally, husband's assertion that the amounts that were paid to Barbara Stratton were a manipulation by the wife and mother and not a correct balance, is not supported by the

-4-

[r]ecord.

With respect to the marital estate, the trial court noted that:

> The Court has previously determined that the marital estate
> value is $656,573.51 [which included the court's valuation of
> the medical practice at $48,000.00 less the $15,965.00 already
> received under the buy/sell agreement, *see* further discussion
> *infra*]. The husband has already withdrawn from the marital
> estate the sum of $117,891.09, representing the Court ordered
> withdrawal of $65,000.00 from the TD Ameritrade Account and
> $15,000.00 from the SunTrust 401k account.... This amount
> also includes the unauthorized withdrawals of $22,413.49 from
> the Morgan Stanley IRA and $15,477.60 from the Fidelity
> Traditional IRA made by husband. The husband's share of the
> marital estate is thereby reduced by $117,891.09. His share of
> the marital estate is therefore $210,396.59.

Ms. Garman was awarded assets totaling $328,285.83 as her portion of the marital estate.
The court then valued and divided the marital debts as follows:

> The [marital] debt of the parties consists of approximately
> $62,000.00 Bank of America credit card debt; a Bank of
> America loan in the amount of $27,000; husband's tax liability
> estimated at $30,000.00; a deficiency to be determined on the
> repossessed Toyota, and wife's debt to her family. The Court
> assesses $56,000.00 of the Bank of America credit card debt to
> husband. By assigning this debt to husband, he assumes the
> debt of $10,000 he spent on his vacations with his girlfriend in
> Italy and the Virgin Islands. The wife shall be responsible for
> $6,000.00 of the Bank of America credit card debt and the debt
> to her family. The husband shall be responsible for the Bank of
> America loan, his tax liability and any deficiency on the Toyota
> vehicle.

The court also awarded Ms. Garman $1,750.00 per month in transitional alimony, for
a period of thirty-six months. Dr. Garman was also ordered to pay Ms. Garman's attorney's
fees and expenses in the amount of $15,000.00 as alimony *in solido*. The final order was
entered on May 28, 2010, by which Ms. Garman was granted a divorce on the ground of
inappropriate marital conduct.

## II. Issues Presented

Ms. Garman appeals, raising five issues as stated in her brief:

> 1. Whether the trial court erred in valuing Dr. Garman's practice in the division of marital property.
>
> 2. Whether the trial court erred in assigning a large debt owed to Ms. Stratton solely to Ms. Garman.
>
> 3. Whether the trial court erred in granting transitional alimony to Ms. Garman rather than alimony *in futuro*.
>
> 4. Whether the trial court erred in determining the appropriate monthly alimony payment amount.
>
> 5. Whether this Court should grant Ms. Garman her reasonable attorney's fees and expenses.

## III. Standard of Review

Before reaching the issues, we first note that, because this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d). Furthermore, when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Whitaker*, 957 S.W.2d at 837; *see also Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

## IV. Analysis

*1. Valuation of Dr. Garman's Medical Practice and Division of Marital Debt*

The division of marital property, including its classification and valuation are findings of fact. *Woodword v. Woodword*, 240 S .W.3d 825, 828 (Tenn. Ct. App. 2007). Trial courts

have "wide latitude in fashioning an equitable division of marital property." *Altman v. Altman*, 181 S.W.3d 676, 683 (Tenn. Ct. App. 2005). Accordingly, the trial court's decisions regarding classification, valuation and division of property are reviewed *de novo* with a presumption of correctness unless the evidence preponderates otherwise. *Farrar v. Farrar*, 553 S.W.2d 741, 743 (Tenn. 1977).

When making its division of property, the trial court must first classify the property. Tennessee recognizes two distinct types or classes of property: "marital property" and "separate property." The distinction is important because Tennessee Code Annotated Section 36-4-121(a) "provides only for the division of marital property." *Batson v. Batson*, 769 S.W.2d 849, 856 (Tenn. Ct. App. 1988). Dividing a marital estate is not a mechanical process; the goal is to fashion an equitable remedy considering the non-exclusive factors set forth in Tennessee Code Annotated Section 36-4-121(c).

The division of marital property is rooted in equity, and a division of marital property is not rendered inequitable merely because it is not precisely equal, *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996); *Ellis v. Ellis*, 748 S.W.2d 424, 427 (Tenn. 1988), or because each party does not receive a share or portion of each marital asset. *Cohen*, 937 S.W.2d at 833 (citing *Brown v. Brown*, 913 S.W.2d 163, 168 (Tenn. Ct. App. 1994)).

Here, the parties introduced a document titled Master Financial Statement as Trial Exhibit 1. This document included an inventory of the parties' marital assets, values for those assets, and liabilities thereon. Most of the values placed on the assets were reached by agreement; however, the parties were at an impasse as to the valuation of Dr. Garman's interest in the OCET practice.

## A. Valuation of the Medical Practice

"The valuation of a marital asset is a question of fact. It is determined by considering all relevant evidence, and each party bears the burden of bringing forth competent evidence." *Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998) (citing *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987)). "If the evidence of value is conflicting, the trial judge may assign a value that is within the range of values supported by the evidence." *Kinard*, 986 S.W.2d at 231 (citing *Ray v. Ray*, 916 S.W.2d 469, 470 (Tenn. Ct. App. 1995); *Wallace*, 733 S.W.2d at 107)). "On appeal, we presume the trial judge's factual determinations are correct unless the evidence preponderates against them." *Kinard*, 986 S.W.2d at 231 (citing *Jahn v. Jahn*, 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996)).

In Tennessee, a professional practice may be considered a marital asset. *See Argo v. Argo*, 1985 WL 673374 (Tenn. Ct. App. April 11, 1985). The court here concluded that Dr. Garman's partnership interest in the OCET practice was a marital asset. From our review of

the record, this classification was proper because Dr. Garman's interest in the practice was attained during the course of the marriage. Proper valuation of this marital asset, however, should include only the value of the practice's tangible assets and not the practice's future earnings or professional goodwill. *Nicholson v. Nicholson*, No. M2010-00042-COA-R3-CV, 2010 WL 4065605, at *5 (Tenn. Ct. App. Oct. 15, 2010) (citing *Argo*, 1985 WL 673374, at *4-5; *Smith v. Smith*, 709 S.W.2d 588, 592 (Tenn. Ct. App. 1985)).

In this case, the court heard evidence regarding the value of the assets of the medical practice, including the testimony of Mr. Van Elkins, Ms. Garman's expert. Mr. Elkins, a Certified Public Accountant, was engaged to perform a valuation on the OCET interest as of June 30, 2009, some four months prior to Dr. Garman leaving the practice. When asked the reason for valuing the interest as of June 30, 2009, Mr. Elkins stated that the buy/sell agreement that was executed in September of 2008 required 120 days' notice from a partner who desired to resign from the partnership. Specifically, Mr. Elkins stated that "it has been my experience that once somebody turns in a notice a lot of times their productivity is not where it's been in the past." This concern, however, does not appear to be the case in the instant lawsuit. Rather, the evidence reveals that, at the time he left the practice in November of 2009, Dr. Garman was a close second in collections among the three doctors in the partnership.

Moreover, the June 30, 2009 valuation falls right before the doctors were scheduled to receive their quarterly bonus, which was a routine practice at OCET. The date of the valuation appears to represent the time of year when the accounts receivable of the practice were the highest (this because the doctors, who practiced in pediatric medicine, would normally perform the bulk of their surgeries during the summer months, when children were out of school). These facts were acknowledged by Mr. Elkins as rendering his initial valuation artificially high.

Mr. Elkins initial report set Dr. Garman's one-third interest in OCET at $114,194.00. It soon became apparent, however, that the initial valuation was flawed in that Mr. Elkins was provided an incorrect depreciation schedule for the fixed assets of the practice that was higher than the actual fixed asset's value. Consequently, there was a $40,000.00 discrepancy in the initial fixed asset value used by Mr. Elkins. The error required an amendment to the value contained in Mr. Elkins' initial report, which brought the valuation of Dr. Garman's interest in OCET from $114,194.00 to $98,034.00. As noted by the trial court, because Mr. Elkins relied upon the "asset approach," i.e., the value of the fixed assets less liabilities, having the correct value of the fixed assets was crucial to arriving at a correct valuation. After applying the correct value of the fixed assets, Mr. Elkins updated and revised his valuation in a new report filed in January of 2010.

Although Mr. Elkins revised his report in January of 2010, there is no evidence that he took a fresh look at the accounts receivable of the practice. In fact, Mr. Elkins acknowledged that, in his experience with valuing medical practices, it was common for a practice to accumulate and pay out cash on a quarterly basis in the form of bonuses. Although Mr. Elkins admitted to being familiar with this common practice, it does not appear that he inquired as to whether OCET followed this custom. However, as confirmed by Dr. Garman and Dr. Adham's testimonies, OCET did, in fact, routinely pay bonuses to the partners on a quarterly basis. As of July 2009, Dr. Garman received a $40,000.00 bonus, and his two partners also received bonuses. During cross-examination, Mr. Elkins conceded that the payment of these bonuses would reduce the overall value of the practice by $91,616.00. Importantly, with the inclusion of the new value of the accounts receivable after the payment of the bonuses (and specifically the $40,000.00 bonus paid to Dr. Garman), the value of Dr. Garman's one-third interest would have been reduced by approximately $30,000.00. As Mr. Elkins stated, "[i]f it was normal practice to pay those [bonuses] and that was an accumulation, then it would reduce [the value placed on the practice]." Consequently, subtracting the $40,000.00 accounts receivable discrepancy from the $98,000.00 value initially placed on the practice by Mr. Elkins, the value of Dr. Garman's interest in OCET was set at approximately $68,000.00. Mr. Elkins made this adjustment on the witness stand, and conceded to the reduced valuation.

After weighing the foregoing evidence, the court specifically found that:

> [H]usband sold his medical practice in November 2009 and both parties received $7,984.50 for their respective share. The wife contends that the practice is worth more than the approximate $15,000 that they received. This Court agrees, but does not accept the total value placed on the practice by Mr. Elkins. Mr. Elkins utilized the fixed asset approach in determining an initial value of the practice to be $114,194.00. However, evidence indicates that this amount did not factor an approximate $40,000.00 "bonus" that husband received shortly after the appraisal nor an updated value of the fixed assets. Taking these factors into consideration, the Court finds the medical practice to be worth $48,000.00 or $24,000.00 to each party. The parties have received $15,965.00 for the practice, leaving $32,031.00 to be added to the value of the marital estate. Thus the marital estate has a value of $656,573.51.

On appeal, Ms. Garman asserts that the court improperly valued the medical practice. We disagree. In the first instance, it appears that the court's valuation properly disregarded

the future earning capacity and professional goodwill of the practice and focused instead on its tangible assets. *See Argo*, 1985 WL 673374, at *5; *Cunningham*, 2000 WL 33191364, at *3. From the record, the evidence concerning the value of the practice is not prolific. The evidence submitted consists of the $15,900.00 that was received under the buy/sell agreement, and Mr. Elkins' testimony. It is the responsibility of the parties, not the court, to propose values to marital property. *Caldwell v. Caldwell*, No. M2007-01205-COAR3-CV, 2008 WL 4613586, at *2 (Tenn. Ct. App. March 5, 2008) (citing *Wallace v. Wallace*, 733 S.W.2d 102, 106 (Tenn. Ct. App. 1987)). The parties are bound by the evidence they present, and the trial court, in its discretion, is free to place a value on a marital asset that is within the range of evidence submitted. *Wallace*, 733 S.W.2d at 107. With this in mind, Mr. Elkins freely admitted that his valuation had failed to account for the bonuses paid by OCET. As set out in its findings, the trial court took this shortcoming into consideration in arriving at its valuation. The trial court apparently selected a value within the permissible range, and offset that value by the bonuses paid and the monies already received under the buy/sell agreement. We find no fault with the trial court valuing the medical practice in this manner. Because the court's valuation is within the reasonable range supported by the record, and because the valuation appears to be well reasoned, we affirm the trial court's valuation of the medical practice.

### B. Marital Debt

On appeal, Ms. Garman maintains that the trial court erred by making her solely responsible for the parties' debt to her family. In addition to the division of marital debt made in the court's findings of facts and conclusions of law set out above, in its final order, entered on May 28, 2010, the court held that Ms. Garman would specifically be responsible for the $6,000.00 debt owed on the Bank of America credit card and would also be responsible for any debt owed to her family.

Our Supreme Court has stated that "marital debts are subject to equitable division in the same manner as marital property." *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003). Marital debts should be distinguished from separate debts. The *Alford* Court stated that "marital debts are all debts incurred by either or both spouses during the course of the marriage up to the date of the final divorce hearing." *Id*. After determining whether certain debt is marital debt, a trial court should next allocate the marital debt between the spouses by evaluating the following factors: "(1) the debt's purpose; (2) which party incurred the debt; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt." *Id*. at 814 (citing *Mondelli v. Howard*, 780 S.W.2d 769 (Tenn. Ct. App. 1989)).

From our review of the trial court's Final Decree, as well as its statements from the

bench, it appears that the court was skeptical with regard to the parties' asserted debts owed to Ms. Garman's family. Ms. Garman's family routinely gifted monies to the parties to help support their lifestyle. As discussed above, there were several mortgages that Ms. Garman's mother maintained on properties owned by the parties. It appears that Ms. Stratton would transfer the mortgage from one property to the next with the last mortgage being held on the parties' Montvale residence. While the "loans" from Ms. Stratton were created in a very businesslike manner, i.e., promissory notes were executed, in reality it does not appear that these financial obligations were collected in a businesslike manner. Rather, it appears that Ms. Garman's family "carried" these loans, and let payments go unpaid when the parties could not make ends meet.

Concerning the $10,000.00 annual "gifts," there is no writing memorializing Ms. Garman's claim that these monies were to be deducted from the mortgage. Rather, it appears that the use of these "gifts" was left to Ms. Garman's discretion. Although Ms. Stratton gifted $10,000.00 per year from 1995 through at least 2005, there is no accounting in the record as to how these monies were actually used.

Concerning Ms. Garman's allegation that she accrued debt by borrowing money from her family during the parties' separation, there is simply inadequate proof in the record that these monies were meant to be repaid so as to categorize them as marital debt. From the totality of the circumstances, and in light of the prior business dealings between Ms. Garman and her family, it appears that there was little expectation that the monies would be repaid. Moreover, no promissory notes were executed to memorialize any repayment schedule.

Ms. Garman cites the case of *Mondelli v. Howard*, 780 S.W.2d 769 (Tenn. Ct. App. 1989) concerning the factors to be used by the court in addressing the division of marital liabilities. We note that *Mondelli* has been rejected with regard to the issue of classification of debt as marital or separate; however, the *Mondelli* factors, dealing with the distribution of debt, remain intact. *Walker v. Walker*, No. M2006-00071-COA-R3-CV, 2007 WL 879569, (Tenn. Ct. App. March 22, 2007), *perm. app. denied* (Tenn. Aug. 20, 2007). Those factors are discussed above. *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003) (citing *Mondelli*, 780 S.W.2d 769).

Applying the foregoing principles to the facts of the instant case, we conclude that the trial court correctly allocated Ms. Garman the alleged debt owed to her family. Ms. Garman has the ability to work and is more than qualified to do so, having received two degrees from Cornell University. However, as demonstrated by the record, it appears that Ms. Garman has been reluctant to enter the workforce in any serious manner. Rather, Ms. Garman (and during the marriage, both Dr. Garman and Ms. Garman) relied upon the largesse of Ms. Garman's family to subsidize a lifestyle that, on their own, would have been impossible to

maintain. There is no indication in the record that Ms. Garman's family has seriously sought repayment of the large sums of money that have been provided to the parties. In fact, concerning Ms. Garman's allegation that she rented a home from her family during the separation, it soon became apparent, during her testimony, that the alleged lease between Ms. Garman and her mother was a sham, having been drafted *ad hoc* in preparation for the trial. More importantly, however, the record indicates that, despite listing rent as a monthly expense on her affidavit, Ms. Garman has, in fact, never paid rent to her mother. Applying the **Mondelli** factors, *supra*, the record indicates that, since the parties' separation, Ms. Garman has solely benefitted from the money given by her family. While Ms. Garman protests that the monies "borrowed" from her parents will have to be repaid, given past dealings, this proposition appears unlikely. While we cannot say with certainty that the alleged debt will be forgiven by Ms. Garman's family, that appears to be the usual course. Given the totality of the circumstances, and in light of the relative equities between the parties, we conclude that the trial court correctly charged Ms. Garman with the debt allegedly owed to her family.

## 2. Alimony Award

We review an award of alimony under the abuse of discretion standard. **Herrera v. Herrera**, 944 S.W.2d 379, 388 (Tenn. Ct. App. 1996). Trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of support. *See* **Garfinkel v. Garfinkel**, 945 S.W.2d 744, 748 (Tenn. Ct. App. 1996). If a discretionary decision is within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative. **White v. Vanderbilt Univ.**, 21 S .W.3d 215, 223 (Tenn. Ct. App. 1999).

When determining whether an award of alimony is appropriate, courts must consider the statutory factors contained in Tennessee Code Annotated Section 36-5-121(i). The two most important factors are the need of the spouse seeking support and the ability of the other spouse to provide such support. *See, e.g.,* **Oakes v. Oakes**, 235 S.W.3d 152, 160 (Tenn. Ct. App. 2007). Alimony decisions, by their very nature, typically hinge on the unique facts and circumstances of the case. *Id*. at 160; *see also* **Anderton v. Anderton**, 988 S.W.2d 675, 683 (Tenn. Ct. App.1998).

Once the trial court has determined that alimony is appropriate, it must determine the nature, amount, and duration of the award. Tennessee Code Annotated Section 36-5-121(d)(1) provides that "[t]he court may award rehabilitative alimony, alimony in futuro, also known as periodic alimony, transitional alimony, alimony in solido, also known as lump sum alimony, or a combination of these."

Tennessee Code Annotated Section 35-5-121(d)(2) reflects a statutory preference favoring rehabilitative spousal support and transitional spousal support over long-term spousal support. *See also* **Bratton v. Bratton**, 136 S.W.3d 595, 605 (Tenn. 2004); **Perry v. Perry**, 114 S.W.3d 465, 467 (Tenn. 2003); **Crabtree v. Crabtree**, 16 S.W.3d 356, 358 (Tenn. 2000). Rehabilitative spousal support is intended to enable an economically disadvantaged spouse to acquire additional education or training that will enable the spouse to achieve and maintain a standard of living comparable to the standard of living that existed during the marriage or to the post-divorce standard of living expected to be available to the other spouse. Tenn. Code Ann. § 36-5-121(e)(1); *see also* **Robertson v. Robertson**, 76 S.W.3d 337, 340-41 (Tenn. 2002); **Smith v. Smith**, 912 S.W.2d 155, 160 (Tenn. Ct. App. 1995).

However, this statutory preference does not entirely displace the other forms of spousal support when the facts of the case warrant long-term or more open-ended support. **Aaron v. Aaron**, 909 S.W.2d 408, 410 (Tenn. 1995). Although rehabilitative, or transitional, alimony is the preferred type, "[w]here there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, ... then the court may grant an order for payment of support and maintenance on a long-term basis...." **Burlew v. Burlew**, 40 S.W.3d 465, 471 (Tenn. 2004) Thus, long-term alimony is intended to provide long-term support to an economically disadvantaged spouse who is unable to be rehabilitated. **Id.**; *see also* **Loria v. Loria**, 952 S.W.2d 836, 838 (Tenn. Ct. App.1997).

The trial court awarded Ms. Garman $1,750.00 per month in transitional alimony for a period of thirty-six months. On appeal, Ms. Garman contends that the trial court erred in this ruling, and specifically argues that she should have been awarded long-term spousal support, in the form of alimony *in futuro*, rather than transitional alimony. We disagree.

These parties were married for approximately seventeen years, which, as the trial court correctly noted, constitutes neither a short-term, nor a long-term marriage. According to the trial court's order, at the time of the hearing in this case, Dr. Garman was 51 years old, and Ms. Garman was 49 years old. Both parties are in good health; in fact, both train and compete in marathon races. Dr. Garman is a physician, and Ms. Garman holds an M.B.A. from Cornell University.

From the totality of the circumstances, it appears that Ms. Garman is very intelligent, in good health, and quite capable of working. While Ms. Garman has pursued only part-time employment for most of the marriage, in favor of staying at home and managing the children and household duties, there is no dispute that she has the ability to earn income considerably greater than that which her part-time employment has provided. We agree with the trial court that Dr. Garman has the ability to earn more money than Ms. Garman. However, Ms. Garman also has the ability to procure more gainful employment than she has heretofore

sought. Given Ms. Garman's work history, her excellent health, and her advanced degree, we cannot conclude that she cannot be rehabilitated in fairly short order. Simply put, the record does not support Ms. Garman's contention that she is so far disadvantaged in comparison to Dr. Garman that she is in need of long-term spousal support.

Because of the divorce, Ms. Garman will need to make a transition from her previous lifestyle and will need to enter the workforce in earnest. In order to accomplish this goal, Ms. Garman will need some assistance; however, as discussed above, the record supports a finding that she is quite capable of being rehabilitated so that she can support herself. Considering the fact that Ms. Garman has need in the immediate future until such time as she can procure employment, and given the fact that, at present, Dr. Garman has the ability to pay, we conclude that the trial court did not abuse its discretion in awarding Ms. Garman transitional alimony, rather than alimony *in futuro*.

Concerning the amount of alimony awarded, Ms. Garman was awarded the sum of $1,750.00 per month. We review this decision for an abuse of discretion. "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citations omitted).

The instant appeal presents an uncommon set of facts. As discussed in detail above, Ms. Garman's family has supported Ms. Garman during the separation. The trial court was concerned, as is this Court, with Ms. Garman's alleged monthly expenses, especially in light of the fact that she claimed rental expenses owed to her family, which she did not, in fact, pay. In short, it is difficult from the record to determine just what amounts Ms. Garman herself pays each month. Ms. Garman appears to have not only the ability to support herself, but also a large safety net in which to land should she choose not to enter the workforce. Accordingly, the award of $1,750.00 per month for three years should allow Ms. Garman ample time to transition following the divorce. Therefore, we conclude that the trial court did not abuse its discretion in setting the amount of alimony in this case.

Ms. Garman has asked this Court to award her attorney's fees incurred in bringing this appeal. An award of appellate attorney's fees is a matter within this Court's sound discretion. *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). In considering a request for attorney's fees on appeal, we consider the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the appeal was taken in good faith, and any other equitable factors relevant in a given case. *Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at * 16 (Tenn. Ct. App. July 19, 2005). Considering all of the relevant factors in this case, we respectfully decline to award Ms.

Garman's attorney's fees in this appeal.

For the foregoing reasons, we affirm the order of the trial court. Costs of this appeal are assessed against the Appellant, Jean Garman, and her surety.

_____
J. STEVEN STAFFORD, JUDGE